**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  July 20, 2026

Mr. Philip Lee Ellison
Outside Legal Counsel
P.O. Box 107
Hemlock, MI 48626

Mr. Erik A. Grill
Ms. Kimberly K. Pendrick
Office of the Attorney General
of Michigan, Civil Rights and Elections
3030 W. Grand Boulevard, Suite 10-650
Detroit, MI 48202

    Re:  Case No. 26-1228
*Lindsay Dyda v. Michigan Secretary of State, et al*
Originating Case No. 1:24-cv-11147

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

        Yours very truly,

        Kelly L. Stephens, Clerk

        Cathryn Lovely
        Deputy Clerk

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0199p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

LINDSAY DYDA,

*Plaintiff-Appellant*,

*v.*

No. 26-1228

MICHIGAN SECRETARY OF STATE,

*Defendant*,

JOCELYN BENSON, in her official capacity; JOSETTE TABOR, in her official and personal capacities,

*Defendants-Appellees*.

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:24-cv-11147—Thomas L. Ludington, District Judge.

Decided and Filed:  July 20, 2026

Before: SILER, DAVIS, and RITZ, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant.  Erik A. Grill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

_____

### OPINION

_____

DAVIS, Circuit Judge.  Lindsay Dyda does not have a Social Security Number for religious reasons.  Based on certain federal regulations and state law, the Michigan Department of State denied her application for a driving permit because she did not provide a Social Security

No. 26-1228                    *Dyda v. Michigan Sec'y of State, et al.*                    Page 2

Number.   Dyda sued Josette Tabor, a help desk worker at the Department, and Michigan Secretary of State Jocelyn Benson under 42 U.S.C. § 1983, asserting that their actions violated the Free Exercise Clause of the First Amendment.   After receiving interpretive guidance from the federal agency responsible for the regulations, the Department is now prepared to process Dyda's application without a Social Security Number.   Dyda appeals the district court's ruling that her claims for declaratory and injunctive relief are moot and that Tabor is entitled to qualified immunity.   We affirm.

## I.

### A. Factual Background

Michigan resident Lindsay Dyda has a sincerely held religious belief that prevents her from obtaining a Social Security Number ("SSN").   The Social Security Administration ("SSA") exempts certain individuals with religious objections from participation in the Social Security system.   *See* 26 U.S.C. § 1402(g)(1).   The SSA granted Dyda a religious exemption, meaning that she lawfully does not have an SSN.

Dyda would like to obtain a Commercial Learner's Permit ("CLP"), a prerequisite to obtaining a Commercial Driver's License ("CDL").   *See* 49 C.F.R. § 383.71 (2025).   The permitting and licensing regimes are regulated by the Federal Motor Carrier Safety Administration ("FMCSA"), a division of the Department of Transportation ("DOT"), and administered by the states.   *See id.* § 384.101–.409.   If a state runs afoul of these federal regulations, the FMCSA can find the state in "noncompliance," which, in turn, could jeopardize the state's ability to obtain federal funding for transportation infrastructure and to participate in the CLP-CDL program.   *Id.* §§ 384.401, .403, .405.

A CLP application has multiple components.   For instance, an applicant must pass knowledge-based testing and clear several eligibility requirements.   *Id.* § 383.71(a); Mich. Comp. Laws § 257.306a(1) (2022).   Most relevant to Dyda, a federal regulation provides that a CLP applicant must "provide his/her Social Security Number on the application of a CLP."   49 C.F.R. § 383.153(e)(1).   A state cannot issue a CLP unless it first verifies that the "Social Security Number provided by the applicant [matches] the information on file with the [SSA]."

*Id.* § 383.73(g)(1).    Accordingly, the Michigan Department of State ("MDOS") requires applicants to provide an SSN "to the extent required to comply with federal law."  Mich. Comp. Laws § 257.307(1)(a) (2025).

Dyda applied for a CLP in March 2024.  In lieu of an SSN, she provided a religious exemption letter from the SSA.  The MDOS denied Dyda's application because she did not provide an SSN.  As to the remainder of her application, the parties agree that Dyda passed the knowledge-based testing.  The parties disagree about whether Dyda fulfilled the remaining eligibility requirements and completed all components of her application.  Dyda testified that her application is complete and that "no other deficiencies existed in [her] application."  (Dyda Decl., R. 40-2, PageID 336).    According to the defendants, however, Dyda still needs to "complete necessary paperwork, such as a self and medical certification form, and pay the applicable license fees."  (Reply Br. in Supp. of Mot. for Summ. J., R. 53, PageID 596).

Dyda contacted the MDOS's CDL Help Desk after her application was denied.  She explained that she did not have an SSN for religious reasons.  Josette Tabor, the Lead Worker at the Help Desk, had never encountered an applicant who claimed a religious exemption from the SSN requirement.  So, in early April 2024, she escalated Dyda's concern to Department Manager Ryan Smith.  He too had never faced a comparable situation.  On April 3, 2024, he contacted Paul Oles, the FMCSA's State Program Specialist for Michigan, for guidance in interpreting the federal regulations, which do not mention any exemption.  Oles explained that the SSN requirement is mandatory.  Smith passed along this information to Tabor, who told Dyda on April 5, 2024, that the FMCSA requires Michigan to collect all applicants' SSNs before the MDOS can issue a CDL.  Smith continued to seek clarification about the scope of the SSN requirement.  Over the next few months, he received conflicting guidance.  But ultimately, Matthew Fabry, the FMCSA Division Administrator for Michigan, explained that Michigan was bound by the SSN requirement, and he was unaware of an exemption for Dyda.

Meanwhile, on April 24, 2024, Dyda found a "Guidance Q & A" page on the FMCSA's website explaining that a licensed commercial driver with an SSN-granted religious exemption does not need to provide an SSN in an employment application.  (Webpage, R. 27-4, PageID 206); *see also* 49 C.F.R. § 391.21(b)(2).  Dyda, believing the regulation to apply to her

No. 26-1228                     *Dyda v. Michigan Sec'y of State, et al.*                     Page 4

CLP application, alerted Tabor to the guidance page.  Tabor responded the next day and explained that the regulation interpreted on the "Guidance Q & A" page does not govern CLP applications.

On September 5, 2025, the FMCSA's Director of the Office of Safety Programs sent a guidance letter to Michigan Secretary of State Jocelyn Benson clarifying the agency's interpretation of the regulations as applied to Dyda.  The MDOS could waive the SSN requirement for Dyda's application, the letter explained, because a state only needs to verify an applicant's SSN "if the applicant has one or is required to have one."  (Guidance Letter, R. 40-4, PageID 339).  Since Dyda has an SSA-granted religious exemption, she lawfully does not have an SSN.  The letter also acknowledged that the MDOS considered Dyda's test results to be expired.  But if the MDOS "relie[d] on [her] 2024 test results to issue a CLP or CDL" and "ensure[d] that [she] complie[d] with all other" federal regulations, the FMCSA confirmed that it would not issue a finding of noncompliance against the MDOS.  (*Id.* at PageID 340).

In response to the guidance letter, the MDOS changed its stance and, going forward, will allow applicants with religious exemptions to waive the SSN requirement in CLP and CDL applications.  The Department is updating internal systems, procedures, and public-facing documents to align with this change.  On September 15, 2025, the Michigan Attorney General's office informed Dyda's counsel that Dyda could "already make an appointment to obtain her CLP at a Secretary of State branch office."  (Email to Counsel, R. 46-4, PageID 445).  Though the MDOS considers her 2024 test results to be expired, which would normally require an applicant to retake the tests, it has agreed to waive that requirement for Dyda.  Dyda testified that she "remain[s] ready, willing, and able to complete any remaining requirements for obtaining [a] CDL."  (Dyda Decl., R. 40-2, PageID 336).

## B.  Procedural History

On April 30, 2024, Dyda sued the FMCSA, DOT, MDOS, and Michigan's Department of Motor Vehicles for violating the First and Fifth Amendments, Title VII of the Civil Rights Act of 1964, and 18 U.S.C. §§ 242 and 245.  Dyda amended her complaint in May 2025.  She sued Benson (in her official capacity) and Tabor (in her official and personal capacities) under § 1983

and requested declaratory and injunctive relief.[1]  The following month, the defendants moved to dismiss for lack of standing and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Tabor invoked qualified immunity.  Dyda opposed dismissal.

Then, in September 2025, the FMCSA sent the aforementioned guidance letter.  In response, Dyda moved for summary judgment on her official-capacity claims against Benson and Tabor.  The defendants, arguing that the case was moot, also moved for summary judgment.

The district court dismissed Dyda's requests for declaratory and injunctive relief as moot and granted Tabor qualified immunity.  *Dyda v. Benson*, No. 1:24-cv-11147, 2025 WL 4351518 (E.D. Mich. Dec. 8, 2025), *report and recommendation adopted*, 2026 WL 523484 (E.D. Mich. Feb. 19, 2026).  The court decided that declaratory relief would restate a matter on which all parties agree: Dyda does not need an SSN to apply for a CLP.  2026 WL 523484, at *6–8.  As for injunctive relief, the court explained that it lacked authority to order the defendants to issue a CLP.  *Id.* at *4–5, 8.  Next, the court found that the defendants' voluntary compliance with the guidance letter mooted the case.  *Id.* at *5–6.  And since Dyda did not identify authority suggesting that Tabor's actions violated a clearly established constitutional or statutory right, the court granted Tabor qualified immunity.  *Id.* at *8–9.  Dyda appealed.

## II.

We review mootness determinations and summary-judgment rulings de novo.  *Graveline v. Benson*, 992 F.3d 524, 531, 534 (6th Cir. 2021).  For purposes of summary judgment, we view the facts in the light most favorable to the non-moving party.  *Guptill v. City of Chattanooga*, 160 F.4th 768, 776 (6th Cir. 2025).  We also review a district court's decision to grant a motion to dismiss on qualified-immunity grounds de novo.  *Chrestman ex rel. Wooden v. Metro. Gov't of Nashville & Davidson County*, 156 F.4th 694, 700 (6th Cir. 2025).  On review of a motion to dismiss, we assume the truth of all well-pleaded factual allegations, view the allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in her favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

---

[1]Dyda voluntarily dismissed her Administrative Procedure Act claims against the FMCSA and DOT.

No. 26-1228                *Dyda v. Michigan Sec'y of State, et al.*                Page 6

### A. Mootness

Dyda argues that her requests for declaratory and injunctive relief are not moot because she still does not have a CLP. She also claims that the defendants' mid-litigation decision to follow the guidance letter leaves open the possibility that they will revert to their initial refusal to process her application. We hold that Dyda's requests for relief are moot, and the defendants' voluntary compliance with the guidance letter demonstrates that no live controversy remains.

***Live Case and Controversy Requirement.*** Article III of the United States Constitution limits the jurisdiction of federal courts to decide live "Cases" and "Controversies." U.S. Const. art. III, § 2. The live-case-and-controversy requirement applies at "all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation modified). Once "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome," our jurisdiction ends, and a lawsuit becomes moot. *Cal. Palms Addiction Recovery Campus, Inc. v. United States*, 158 F.4th 726, 730 (6th Cir. 2025) (citation modified).

Dyda tied her requests for declaratory and injunctive relief to the initial refusal to process her application. She asked the district court to declare that her "First Amendment Rights are currently, are on an ongoing basis, and have been violated" and that the defendants' "policy, custom, and practice" of denying religious exemptees a CLP or CDL violates the First Amendment. (Am. Compl., R. 27, PageID 198). She also asked the court to enjoin "the ongoing denial of issuance of" a CLP "that [she] is entitled to receive." (*Id.*). We take each request in turn.

Courts can only "declare the rights and other legal relations," 28 U.S.C. § 2201(a), of parties when "there is a substantial controversy . . . *of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment," *Thompson v. DeWine*, 7 F.4th 521, 524 (6th Cir. 2021) (citation omitted). Without a live controversy to resolve, courts lack jurisdiction to declare "that past actions which have no demonstrable continuing effect were right or wrong." *Hanrahan v. Mohr*, 905 F.3d 947, 962 (6th Cir. 2018) (citation omitted). No ongoing controversy exists here. The defendants are no longer asking Dyda to provide an SSN, meaning that the district court cannot declare that her First Amendment rights are currently or on an ongoing basis being

violated. And, as discussed below, they are in the process of ensuring as a matter of policy and practice that nobody in Dyda's position encounters that same obstacle when applying for a CLP. These actions demonstrate that the initial refusal to process her application has no demonstrable continuing effect on Dyda's present ability to seek a CLP. This leaves her request for a retroactive declaration that her rights *were* violated. *Hanrahan* forecloses that request. *See id.* Thus, Dyda's requests for declaratory relief are moot.

Regarding Dyda's request for injunctive relief, one telltale sign that a case is moot is when "events during the pendency of the litigation" make a later court decision "lack any practical effect." *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022) (en banc) (quoting *Ohio v. EPA*, 969 F.3d 306, 308 (6th Cir. 2020)). A decision lacks practical effect when granting the requested relief would not affect the legal rights of the parties. *See Ohio*, 969 F.3d at 308. That is the case here. The defendants are not engaging in the conduct that Dyda asked the district court to enjoin: refusing to process her application because she lacks an SSN. Indeed, the MDOS has waived the otherwise mandatory requirement that she retake the requisite tests. Although Dyda maintains that this case is still live because she does not have a permit in hand, the issuance of the permit depends on Dyda's completion of all components of her application—a matter over which the parties disagree—not her obtaining an SSN. And to the extent that Dyda suggests that the court could or should order the defendants to immediately issue the permit, that request exceeds the injunction against the "ongoing denial" that she originally sought. (Am. Compl., R. 27, PageID 198). This posture leaves no conduct for the district court to enjoin. Thus, granting her requested injunctive relief would lack practical effect.

***Voluntary Cessation.*** Next, Dyda argues that her requests are not moot because there is a reasonable likelihood that the defendants will revert to their old ways. The defendants stress that their change in posture was a genuine response to the intervening federal guidance and thus renders this case moot.

Under the voluntary cessation doctrine, "a defendant's voluntary cessation [of the challenged conduct] moots a case only if, considering the circumstances as a whole, there clearly is no reasonable expectation that the alleged violation will recur." *Ohio*, 969 F.3d at 309 (citation modified). We have described a reasonable expectation as "a fair prospect that the

conduct will recur in the foreseeable future," *id.* at 310, rather than a "theoretical possibility" that "the challenged conduct [might] recur." *Thomas v. City of Memphis*, 996 F.3d 318, 327–28 (6th Cir. 2021). The party claiming mootness bears the burden of showing that the doctrine applies. *Id.* at 324.

When the defendant is a state entity, "we presume that the same allegedly wrongful conduct . . . is unlikely to recur." *Gun Owners of Am., Inc. v. U.S. Dep't of Just.*, 157 F.4th 834, 838 (6th Cir. 2025) (citation omitted). "[G]overnment self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine." *Hanrahan*, 905 F.3d at 961 (citation modified). Even so, the process for making regulatory changes matters. For instance, changes left to the discretion of a single individual or agency, or changes left to be implemented absent any formal process, will require "significantly more" to demonstrate mootness where there has been voluntary cessation. *Gun Owners*, 157 F.4th at 838 (quoting *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019)). What this observation boils down to is simply that the record must otherwise support that the government's action is genuine.

Timing often can separate genuine course correction from temporary behavioral adjustments designed to extinguish pending litigation. *See Resurrection Sch.*, 35 F.4th at 529. And when a state entity course corrects to comply with the law, it is less likely that the entity will "snap back to the old . . . policy once freed from [the present] litigation." *Gun Owners*, 157 F.4th at 837–39 (holding that a legal challenge to a federal agency's policy became moot where the agency replaced the challenged policy with a policy embracing the opposite approach); *accord Davis v. Colerain Twp., Ohio*, 51 F.4th 164, 175 (6th Cir. 2022) (collecting authority to show that a governor's decision to revoke an order to comply with a state supreme court opinion mooted challenges to the invalidated order).

Here, the defendants changed course to heed the FMCSA's new interpretation of the regulations. The timing of their actions indicates that their course correction was genuine. The guidance letter arrived on September 5, 2025. The MDOS and the Michigan Attorney General's office both reviewed the guidance. And ten days later, the Attorney General's office advised Dyda's counsel that the MDOS would comply with the FMCSA's fresh guidance. Now, the MDOS is systematically implementing changes to align with the guidance letter. As in *Gun*

*Owners*, 157 F.4th at 839, and *Davis*, 51 F.4th at 175, we see no reason to believe that the defendants would enforce a policy that they now know contravenes the FMCSA's interpretation. The defendants have met their burden to show that their genuine course correction mooted Dyda's claims for relief tied to enforcement of the old policy. *See Hanrahan*, 905 F.3d at 961.

Dyda doubts the sincerity of the government's actions. But the record demonstrates that Michigan officials' sustained and thoughtful attempts to ascertain and comply with federal guidance began before Dyda sued. *Cf. Resurrection Sch.*, 35 F.4th at 529. Tabor escalated Dyda's legal concerns, Smith sought guidance from his federal counterpart, Tabor ensured that Dyda was aware of this communication, and Tabor informed Dyda that the "Guidance Q & A" interpreted a regulation that did not apply to Dyda's circumstances—all before Dyda filed her first complaint. Smith continued asking federal officials to interpret the scope of the regulations after Dyda filed suit. We see no record evidence—nor does Dyda direct our attention to any— suggesting that these actions were insincere. *See Davis*, 51 F.4th at 175. As we have explained, the possibility that the challenged conduct could theoretically recur does not amount to "a fair prospect" that it will in the foreseeable future. *Ohio*, 969 F.3d at 310.

For the above reasons, Dyda's requests for declaratory and injunctive relief are moot.

## B. Qualified Immunity

Next, Dyda contends that Tabor is not entitled to qualified immunity because she violated Dyda's clearly established "right to be free from religious discrimination in accessing public benefits." (Appellant's Br., ECF 6, 26). Dyda also argues that the district court prematurely ruled on qualified immunity at the motion-to-dismiss stage. We affirm the dismissal of the complaint on qualified-immunity grounds.

Qualified immunity shields state officials performing discretionary functions from liability for civil damages unless they violate a clearly established statutory or constitutional right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" by "protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* at 743 (citation modified). On review of a grant of qualified immunity at the motion-to-dismiss stage,

we ask (1) whether the complaint contains allegations that plausibly establish that an official violated a right, and (2) whether the right was clearly established when the alleged violation occurred. *See Chrestman*, 156 F.4th at 700–01. We may address these two prongs in the order of our choosing. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). "If one prong is decisive," then we need not address the other. *Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 694 (6th Cir. 2022) (addressing only the clearly established prong).

*Clearly Established Right.* The district court decided the issue based on the second prong of the inquiry, and because we agree with its determination, we begin and end with the clearly established prong also. A right is clearly established when "the contours of a right are sufficiently clear [such] that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (citation modified). Although we do not require a case that is "a perfect match to the facts and circumstances of this case," *Chrestman*, 156 F.4th at 706, the right at issue must be defined "in a particularized sense," *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (citation modified), such that "in the light of pre-existing law the unlawfulness [is] apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (citation modified). The point of this particularity requirement, we have explained, is to "ensure offic[ials] have a fair and clear warning that certain conduct" is unconstitutional. *Eastep v. City of Nashville*, 156 F.4th 819, 833 (6th Cir. 2025) (citation modified); *cf. Blackwell v. Chisholm*, Nos. 24-1947/1951, 2025 WL 3091125, at *7 (6th Cir. Nov. 5, 2025) (identifying cases that have accepted a somewhat broader legal statement to satisfy the clearly established prong for First Amendment retaliation claims). And in qualified-immunity cases involving a state official's interpretation of a statute, we "need not decide exactly what the statute means if the [official] reasonably interpreted it." *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 621 (6th Cir. 2021).

The Free Exercise Clause protects an individual's right to be free from religious-based discrimination when seeking public benefits. *See Carson ex rel. O. C. v. Makin*, 596 U.S. 767, 778 (2022) (collecting authority). A corollary to that principle, however, is that laws incidentally

burdening religious exercise do not infringe on religious liberty if they are neutral and generally applicable. *Emp't Div., Dep't. of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878–79, *superseded by statute on other grounds*, Religious Freedom Restoration Act of 1993, Pub. L. No. 103–141, 107 Stat. 1488, *as recognized in Tanzin v. Tanvir*, 592 U.S. 43, 45 (2020); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 533, 541 (2021) (declining to revisit *Smith* on this point). "Neutral" means that "the law at issue [does not] discriminate[] against some or all religious beliefs or regulate[] or prohibit[] conduct because it is undertaken for religious reasons." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). A law is "generally applicable" when it does not "selective[ly] . . . impose burdens" based on religion. *Id.* at 543; *see Fulton*, 593 U.S. at 534; *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

To be sure, the enforcement of laws dealing with access to publicly funded programs that offer no exemptions, religious or otherwise, can violate the Free Exercise Clause. This occurs when, in practice, religious claimants are treated less favorably. For instance, in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 454–58, 462–63, 466–67 (2017), the Supreme Court invalidated a state grant program that forbade an otherwise eligible preschool associated with a Lutheran Church from receiving funding based only on its religious character. And in *Espinoza v. Montana Department of Revenue*, 591 U.S. 464, 487–88 (2020), the Court held that a state program that prevented parents of school-aged children from using state vouchers to pay for Christian schools violated the Free Exercise Clause. *See also Sherbert v. Verner*, 374 U.S. 398, 409–10 (1963) (holding that a Seventh-day Adventist adherent cannot be disqualified from receiving unemployment benefits based on her religious objection to working on Saturdays). These cases underscore the "basic principle" that laws discriminating against applicants based on religious status contravene the Free Exercise Clause's anti-discrimination guarantee and thus face strict scrutiny. *Trinity Lutheran*, 582 U.S. at 458, 463 (condemning discrimination against "the Church—solely because it is a church"); *Espinoza*, 591 U.S. at 475, 477 (citation modified) (condemning discrimination "based on religious status" by "appl[ying] the [law] solely by reference to religious status").

Yet, relevant here, *Bowen v. Roy* demonstrates how these principles apply to SSN requirements. 476 U.S. 693 (1986) (plurality opinion). In that case, parents who received

federally funded, state-administered nutrition assistance unsuccessfully sought an exemption from the program's SSN requirement based on their religious belief that obtaining an SSN for their daughter would harm her spirit. *Id.* at 695–98. The program did not allow individual exemptions. *Id.* at 708. The Supreme Court upheld the law against the parents' free-exercise challenge. *Id.* at 711–12. Affirming the principle that "mere denial of a governmental benefit by a uniformly applicable statute does not constitute infringement of religious liberty," the Court distinguished the unavailability of an exemption from a discriminatory refusal to grant an exemption based on an applicant's religious convictions. *Id.* at 704, 706–09. The SSN requirement in the nutrition-assistance program passed constitutional muster, the Court explained, because it was "wholly neutral in religious terms," and the unavailability of an exemption applied uniformly to all applicants. *Id.* at 703–04.

Homing in on the regulatory regime here, CLP applicants "must provide [their] Social Security Number," and the state processing the applicant "must provide the Social Security Number" to federal regulators. 49 C.F.R. § 383.153(e)(1)–(2); *see* Mich. Comp. Laws § 257.307(1)(a). A state cannot issue a CLP until it confirms that the "Social Security Number provided by the applicant [matches] the information on file with the Social Security Administration." 49 C.F.R. § 383.73(g)(1). Michigan law incorporates the SSN requirement "to the extent required to comply with federal law." Mich. Comp. Laws § 257.307(1)(a).

Dyda asserts that "[t]he right to be free from religious discrimination in accessing public benefits" was clearly established when she applied for a CLP. (Appellant's Br., ECF 6, 26). Yet her framing is the kind of high-level, generalized statement of law that courts routinely reject. *White*, 580 U.S. at 79 (per curiam). Instead, the claimed right must be defined in a way that respects the particular facts here. *Reichle*, 566 U.S. at 665. To refresh, Dyda alleged that Tabor misapplied the federal regulations, refused to process Dyda's application without an SSN, and said that the FMCSA requires all CLP applicants to have an SSN, all in violation of Dyda's First Amendment rights.[2]

---

[2]Dyda's amended complaint also asserts that, based on her reading of the regulations and the "Guidance Q & A" page, Tabor's interpretation was incorrect. But our obligation to assume the truth of well-pleaded factual

Yet the trio of Supreme Court cases that Dyda identifies merely supports her broad doctrinal statement. *See Sherbert*, 374 U.S. 398; *Trinity Lutheran*, 582 U.S. 449; *Espinoza*, 591 U.S. 464. Dyda makes no attempt to analogize the factual circumstances in any of these cases—none of which involved questions of individual liability of government officials or qualified immunity—to hers. And we see little similarity. The Michigan statute that Tabor sought to enforce against Dyda did not resemble any of the statutes discussed in *Sherbert*, *Trinity Lutheran*, and *Espinoza*. Instead, it was facially neutral; it applied broadly to all applicants seeking a CLP. And Dyda has not alleged that Tabor permitted others who lacked an SSN for reasons other than religion to move forward with their applications. *See Tandon*, 593 U.S. at 62 (per curiam). Under those circumstances, we doubt that the "unlawfulness" of the SSN requirement was "apparent." *Anderson*, 483 U.S. at 640. So considering her obligation to "identify published on-point caselaw . . . with facts similar enough that it squarely governs this [case]," Dyda's argument fails. *Ali v. Adamson*, 132 F.4th 924, 936 (6th Cir. 2025) (citation modified).

*Bowen*, on the other hand, is more analogous to the particularized facts of this case and could lead a reasonable official to believe that enforcing the SSN requirement would not violate clearly established law. After all, the CLP licensure program shares some features with the law upheld in *Bowen*: It operates to comply with federal law and is administered by state officials; conditions receipt of a thing of value on providing an SSN; and does not contemplate any exemptions to the SSN requirement. *Contrast Fulton*, 593 U.S. at 535–36. A reasonable official could glean from *Bowen* that the CLP program's SSN requirement is the kind of neutral, generally applicable law that does not infringe on religious liberty even when its application incidentally burdens religious exercise. 476 U.S. at 699–704 (plurality opinion); *see also Smith*, 494 U.S. at 878–79. In qualified-immunity terms, *Bowen* did not put Tabor on notice that enforcing the SSN requirement would violate the Free Exercise Clause. *See Eastep*, 156 F.4th at 833.

---

allegations does not extend to "legal conclusion[s] couched as [] factual allegation[s]." *Iqbal*, 556 U.S. at 678 (citation modified).

And consider the laws themselves. The federal regulations require an applicant to provide an SSN and require the state to cross-reference the SSN with information on file with the SSA. 49 C.F.R. §§ 383.153(e)(1)–(2), 383.73(g)(1). Michigan law requires CLP applicants to provide an SSN "to the extent required to comply with federal law." Mich. Comp. Laws § 257.307(1)(a). Bound by these laws, Tabor advised Dyda that applicants are legally required to have an SSN. That communication reflects a reasonable understanding of the laws' contents. *See Barrera*, 12 F.4th at 621. With no binding authority suggesting otherwise, we cannot say that Tabor's enforcement of these laws resembles plain incompetence or a knowing violation of law. *See al-Kidd*, 563 U.S. at 743. At most, the factual allegations show that Tabor acted based on a "reasonable but mistaken judgment[] about [an] open legal question[]"—the kind of conduct that the doctrine of qualified immunity is designed to protect. *Id.*

Resisting this end, Dyda argues that qualified immunity does not shield officials who interpret a statutory SSN requirement in a manner that burdens religious exercise. That gets *Bowen* backwards. Still, Dyda points us to *Groh v. Ramirez*, 540 U.S. 551 (2004), in arguing that officials cannot offer a post hoc interpretation of a statute to avoid liability. But *Groh* is inapposite; it dealt with the "basic rule" that warrantless searches are presumptively unconstitutional—a requirement of which "[n]o reasonable officer could claim to be unaware." *Id.* at 564. It did not address statutory interpretation or execution. Contrast *Barrera*, 12 F.4th at 621, which explains that the dispositive issue is whether Tabor interpreted the statute reasonably. We believe that she did. In view of then-existing precedent, we give Tabor the "breathing room" that qualified immunity allows. *al-Kidd*, 563 U.S. at 743.

***Resolution under Rule 12(b)(6).*** Finally, Dyda argues that the district court ruled on qualified immunity too soon. We encourage district courts to resolve a qualified-immunity defense "at the earliest possible point" of litigation. *Chrestman*, 156 F.4th at 701 (citation omitted). But we have cautioned that qualified immunity is "usually" better addressed after the parties have engaged in discovery. *Id.* (citation omitted). Still, we will uphold a district court's decision to grant qualified immunity at the motion-to-dismiss stage when "it is apparent from the complaint that the law was not clearly established." *Kenjoh*, 23 F.4th at 695 (citation modified). We perceive no error in the district court's dismissal on qualified-immunity grounds. As we

have concluded, Dyda has not pleaded facts plausibly showing that Tabor's conduct violated a clearly established right.  Because Dyda's failure to prevail on one qualified-immunity prong is fatal, we agree that Tabor is entitled to qualified immunity at this early stage of litigation.  *See id.*

## III.

For these reasons, we **AFFIRM**.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 26-1228

LINDSAY DYDA,

     Plaintiff - Appellant,

     v.

MICHIGAN SECRETARY OF STATE,

     Defendant,

JOCELYN BENSON, in her official capacity; JOSETTE
TABOR, in her official and personal capacities,

     Defendants - Appellees.

> **FILED**
> Jul 20, 2026
> KELLY L. STEPHENS, Clerk

Before:  SILER, DAVIS, and RITZ, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.

THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_Kelly L. Stephens_

_____
Kelly L. Stephens, Clerk